Argued and submitted February 20, reversed and remanded July 23, 2008

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## LOUIS JOHN DELORETTO,
*Defendant-Appellant.*

Marion County Circuit Court
05C45532; A130694

189 P3d 1243

Lawrence Matasar argued the cause and filed the brief for appellant.

Kaye E. McDonald, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Landau, Presiding Judge, and Schuman, Judge, and Ortega, Judge.

SCHUMAN, J.

Ortega, J., concurring.

## SCHUMAN, J.

A jury found that defendant, a high school teacher, rubbed his arm against the breasts of one of his students without her consent and for the purpose of gratifying his sexual desire. The trial court entered a judgment of conviction for sexual abuse in the third degree. ORS 163.415.[1] On appeal, defendant argues that the court committed several reversible errors. First, he argues that the court erred in denying his motion for a new trial. The motion was based on the state's failure, until after the verdict, to provide him with information that he maintains would have shown that the complaining student had once made a false allegation of rape. With that information, he argues, he could have impeached her credibility and altered the outcome of the case. Second, he argues that the court erred in failing to provide him, until after the trial, with hospital records from the night of the alleged rape. He had subpoenaed those records to the court for *in camera* review, and he maintains that they would have confirmed that the allegation of rape was false. Third, he argues that the trial court erred by allowing evidence of uncharged misconduct. And fourth, he argues that the court erred by denying his motion for a mistrial after the prosecutor concluded his closing argument by asking the jury to vindicate the victim. We conclude that the court erred in admitting some of the evidence of defendant's uncharged conduct and that admitting it was prejudicial. We therefore reverse and remand.

Factual details will emerge in our discussion of defendant's assignments of error. In brief: The victim, K, was a student and teacher's aide in defendant's high school history class. In April 2005, she reported to a school guidance

---

[1] ORS 163.415 provides:

"(1) A person commits the crime of sexual abuse in the third degree if the person subjects another person to sexual contact and:

"(a) The victim does not consent to the sexual contact; or

"(b) The victim is incapable of consent by reason of being under 18 years of age."

"Sexual contact" is defined as "any touching of the sexual or other intimate parts of a person * * * for the purpose of arousing or gratifying the sexual desire of either party." ORS 163.305(6).

counselor that, when she went to defendant's class after missing a day of school, he "put his left arm across my breasts and grabbed my right shoulder and jokingly said, 'Never miss my class again.'" K reported that defendant had previously acted toward her in ways that made her feel uncomfortable. On the same day as the reported incident, he had winked at her in a flirtatious manner. Once, while K was walking past defendant's desk to go to the computer and she accidently bumped his chair, he turned around and placed his hand on her lower back and kept it there as she walked past him. On a different occasion, he had shuffled through papers that she was holding in her lap, and while doing so, he placed his arms on her upper thigh. The breast-touching incident, however, was the first that led to a complaint. As a result of that complaint, defendant was charged with sexual abuse in the third degree.

Defendant's primary theory at trial was that the incident did not occur. On cross-examination of K, he attempted to show that another student, D, had teased K by saying that defendant flirted with her, and that the teasing might have led her to make a false accusation. Defendant also introduced evidence that the police report of the incident, based on K's statements, specified that it had occurred in the hallway rather than the classroom. Both the defense and the prosecution called students from defendant's class to testify as to whether they had seen defendant touch K. Several students testified that they never saw such conduct; others testified that they did. The jury, as noted, ultimately returned a verdict finding defendant guilty of sexual abuse in the third degree.

## I. ADMISSION OF EVIDENCE OF UNCHARGED CONDUCT

We begin with defendant's third assignment of error, because it is dispositive. Before trial, the state filed a motion to admit evidence that defendant had exhibited inappropriate behavior toward female students in the past. Defendant argued that the incidents were uncharged misconduct and were not relevant to any fact in issue; his defense in this case was not that the inappropriate behavior was accidental or that he had touched K without any sexual intent, but that no touching occurred. *See State v. Baughman*, 164 Or App 715,

995 P2d 551 (2000), *rev dismissed*, 333 Or 596 (2002) (uncharged conduct evidence showing intent inadmissible where defendant does not contest intent but denies that the allegedly intentional act occurred). The trial court agreed with defendant, but only provisionally. It ruled that evidence of the alleged misconduct involving other victims was inadmissible, "provided that the court may reconsider this ruling should the defense pursue a course of conduct during trial that leads the court to conclude that such evidence has become relevant and admissible."

Throughout the trial, defendant attempted to create doubt about whether he had touched the victim's breasts. During his closing argument, however, defense counsel implied that even if the touching had occurred, it was an "innocent event[ ]" and that the victim may have interpreted it as sexual because teenagers think about "sexual kind of things a lot." In response, the court allowed the state to reopen its case and present testimony from three female former students who alleged that defendant had inappropriately touched them as well.

In his third assignment of error, defendant argues that the trial court erred by allowing the three students to testify about the earlier uncharged incidents. According to defendant, admitting the evidence ran afoul of the prohibition in OEC 404(3):

> "Evidence of other crimes, wrongs or acts is not admissible as evidence to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

The state responds that the evidence was admissible to prove that, contrary to the assertion in his closing argument, defendant acted with the requisite intention, that is, when he touched K's breasts, he did so "for the purpose of arousing or gratifying the sexual desire of either party." ORS 163.305(6).

■     In *State v. Johns*, 301 Or 535, 548, 725 P2d 312 (1986), the court explained that, under OEC 404(3), otherwise relevant evidence of uncharged misconduct is admissible unless the evidence "is offered *solely* to prove (1) the character of a person, and (2) that the person acted in conformity

therewith." (Emphasis added.) Thus, if the disputed evidence is relevant to the question of intent—if, in other words, a rational factfinder could conclude that, because defendant acted as he did in the earlier incidents, he likely acted with sexual intent when he touched K's breasts—then evidence of those incidents was admissible. *Johns*, 301 Or at 551. The court in *Johns* established a multipart inquiry to determine whether uncharged misconduct is relevant to intent in a charged crime:

"(1) Does the present charged act require proof of intent?

"(2) Did the prior act require intent?

"(3) Was the victim in the prior act the same victim or in the same class as the victim in the present case?

"(4) Was the type of prior act the same or similar to the acts involved in the charged crime?

"(5) Were the physical elements of the prior act and the present act similar?

"(6) If these criteria are met, is the probative value of the prior act evidence substantially outweighed by the danger of unfair prejudice, confusion of issues or misleading the jury, undue delay or presentation of cumulative evidence?"

*Id.* at 555-56. The inquiry is cumulative: if the answer to any of the first five inquiries is negative, then the evidence is not relevant and the court need not proceed to the balancing in the sixth inquiry, presumably because irrelevant evidence is of *no* probative value. *State v. Pratt*, 309 Or 205, 211, 785 P2d 350 (1990). The state has the burden of establishing relevance, *id.* at 210, and we review the trial court's determination of the first five inquiries for legal error. *State v. Mills*, 153 Or App 611, 614-15, 958 P2d 896 (1998), *rev den*, 328 Or 275 (1999).

█ The disputed testimony described several incidents. One of the witnesses, L, testified that defendant was her basketball coach when she was in high school in the 1980s. She described an incident when defendant hugged her, picked her up, and spun her around while singing, "I've been waiting for a girl like you." On different occasions, while she was stretching in the gym, he whispered, "I like the way you smell this

time of the month," and, while she was doing hamstring curls, he told her, "I like the way your hips move when you do that." Another student, H, testified that defendant had placed his hands on her shoulders and rubbed them while she was in his class. She explained that the incident occurred when she was upset due to an unrelated incident, and he was trying to comfort her. The last student to testify, M, said that defendant had placed his hand on her lower back to escort her out of the classroom and into the hallway.

We conclude that the three incidents involving physical contact are irrelevant under the second *Johns* inquiry, "Did the prior act require intent?" 301 Or at 555. In the context of this case, that inquiry means that, in order to be relevant to the question of defendant's sexual intent with respect to K, the earlier acts also had to have been performed with sexual intent. But hugging L in the school hallway and singing to her, rubbing H's shoulders in a classroom, and guiding M out of a classroom by touching her lower back, are themselves actions of uncertain and quite possibly innocuous motivation. The state cannot prove that a charged act was performed with sexual intent by presenting evidence of uncharged acts that themselves may or may not have been sexual. Admitting testimony about those incidents was error.

However, for the same reason that the testimony should not have been admitted, admitting it does not require reversal. Evidentiary error is not presumed to be prejudicial, OEC 103(1), and reversal is required only if the error "substantially affect[ed] the rights of a party." ORS 19.415(2). "Perhaps the best approximation of our inquiry is that we view evidentiary error as reversible error * * * when, based on our assessment of the whole record, we believe that there was a substantial possibility that the error affected the result of the trial." *Brown v. Boise-Cascade Corp.*, 150 Or App 391, 419, 946 P2d 324 (1997), *rev den*, 327 Or 317 (1998). Precisely because public hugs, brief shoulder rubs, and light touches to the small of the back are so common and so rarely indicative of a desire to gratify sexual urges, the evidence that defendant engaged in that conduct did not create a substantial possibility of impugning his character in the estimation of the jurors and thereby causing an erroneous result.

■     The remaining incidents of uncharged misconduct—defendant's inappropriate and offensive remarks to L—are also irrelevant to the question of intent. Although they do, at least arguably, show sexual motivation, they are not sufficiently similar to the charged misconduct to pass the fourth and fifth *Johns* inquiry: the acts are not of a "type" that is similar to the "type" of act charged, and they do not have similar "physical elements."

Although similarity between uncharged and charged misconduct must be gauged on a case-by-case basis, *Pratt*, 309 Or at 214, cases from the Supreme Court and this court provide helpful guidance. In *Pratt*, the defendant was charged with sexually assaulting and then murdering an employee during a business-related road trip from Washington to Oregon. The trial court allowed the state to introduce evidence of an earlier crime in which the defendant abducted a former girlfriend, drove her from Washington to Oregon, forced her to have sex with his friend while he watched, and then sexually assaulted her himself. The Supreme Court noted striking similarities:

> "1)   Both victims were transported from Washington into Oregon

> "2)   Both victims were sexually assaulted; and,

> "3)   During the course of each crime someone was bound and gagged with duct tape and paper towels."

*Id.* at 213. Nonetheless, the court concluded that the two crimes were dissimilar for purposes of a *Johns* analysis:

> "A comparison of the two crimes in this case demonstrates that the similarities between the physical elements of the two crimes do not outweigh the differences: [In the earlier crime,] Lewis was publicly abducted at gunpoint by defendant, who had an accomplice. [In the charged crime,] Love's murder involved no abduction, no gun, and no accomplice. Lewis was raped at a motel during a significant interruption of a trip. Love, if she was raped at all, was raped in a truck or by the side of a road. Lewis was raped, but not otherwise seriously injured. Love was brutally stabbed, asphyxiated, and run over. Even one of the similarities is questionable. In the Lewis abduction the witnesses were bound and gagged, not the victim herself as in

the Love murder. Aside from its tendency to show that defendant is the sort of man who commits rape, the Lewis abduction and rape is not probative of defendant's intent to rape Carrie Love."

*Id.* at 214 (footnote omitted).

*Pratt*, then—the first Supreme Court case to apply the *Johns* analysis—establishes a stringent test for similarity. A review of subsequent cases involving the issue in this case, that is, whether uncharged misconduct evincing an intent to gratify sexual desire is relevant to prove sexual intent in the charged misconduct, confirms this stringency.[2] Although we cannot say that the cases establish a bright line between relevant and irrelevant uncharged misconduct deployed to prove sexual intention based on similarity of circumstances, it is nonetheless clear that, wherever that line might be, defendant's comments to L are on the irrelevant side. To conclude that uncharged misconduct is sufficiently similar to charged conduct, we have consistently held that the acts must bear something close to a point-by-point correspondence. We have never held that a *verbal* incident is sufficiently similar to *actual touching*, as the state would have us hold here, even when the verbal incident was much more suggestive than the ones in this case and, unlike the situation here, it involved the same victim. Further, although temporal proximity is not a factor that is captured in any of the *Johns* inquiries, the court in that case did explicitly counsel, "[T]he closer in time of the prior act to the act charged, the greater the probative value; the more remote, the less probative value." 301 Or at 555. For all of these reasons, we conclude that the court erred in admitting evidence of defendant's comments to L.

■   We also conclude that admitting them was prejudicial, that is, that there is a substantial *possibility*—not probability—that it affected the outcome of the trial. *Brown*, 150 Or App at 419. Hearing that a high school teacher and basketball coach once told a teenage student that he "like[d] the way [she] smell[ed] this time of the month," and that he also told her, during another exercise session, that he "like[d] the

---

[2] The cases, along with brief summaries, are collected in the Appendix to this opinion, 221 Or App at 328.

way [her] hips move[d]," a rational juror would be hard pressed to avoid concluding that the teacher was a bad person who deserved to be punished for his repulsive and (to use the colloquial adjective that springs most immediately to mind) creepy conduct. There is a significant and dispositive difference between being an unconscionably inappropriate teacher and being guilty of third-degree sexual abuse, and admitting defendant's statements to L quite possibly led the jury to disregard that difference.

## II. DENIAL OF DEFENDANT'S MOTION FOR A NEW TRIAL

Defendant's first two assignments of error involve assertions that he was wrongly denied information that would have allowed him to undermine K's credibility by presenting evidence to the jury that, in 2002, she had made a false allegation of rape. In the interest of judicial efficiency, we address those aspects of the assignments of error that are likely to arise on remand.

■     In his first assignment, defendant argues that the trial court should have allowed his motion for a new trial because, under *Brady v. Maryland*, 373 US 83, 83 S Ct 1194, 10 L Ed 2d 215 (1963), his right to due process was violated when the prosecution failed to turn over evidence of the false allegation. His second assignment focuses on the trial court's failure to provide him with hospital records from K's visit to the emergency room after the alleged 2002 rape. Although he presents the court's failure as a separate and independent assignment, its real import is interwoven with the assignment regarding the *Brady* violation; the trial court failed to turn over the 2002 hospital records because defendant asked for *2003* records. He maintains that, if the prosecutor had provided him with requested information about the rape allegation, he would have known to request, and would have obtained, the 2002 hospital records. Thus, defendant's argument that the court erred in denying him a new trial is based on the fact that, because the prosecution withheld information about a rape allegation, he had neither the police reports nor the hospital reports.

.    The factual background relevant to this assignment of error is as follows. Before the trial began, a defense investigator interviewed many of K's classmates. Some of them told the investigator that they did not believe that K was a truthful person and that she had once made a false accusation of sexual assault against a former classmate. The students reported that a Marion County Deputy Sheriff named "Matt" had interviewed them regarding the 2002 allegation. Based on that information, defense counsel sent a letter to the district attorney's office requesting any information about the 2002 incident. The district attorney responded with a letter stating, "I have checked with both OASIS and the Marion County Sheriff's Office records division for these reports. I was unable to locate any such reports by [K] involving a previous sexual assault or rape allegation."

Defense counsel also subpoenaed medical records from the local hospital where, he believed, K had received treatment after the alleged rape. He requested that the trial court inspect the documents *in camera* and provide him with any evidence relating to an emergency room visit by K "in approximately August of 2003." The trial court conducted the *in camera* inspection, but did not discover any medical records that fit defense counsel's description, and therefore did not provide any records to him.

Thus, defense counsel discovered no evidence to corroborate the reports that K had made a false allegation of rape. As a result, defense counsel did not call the students who accused K of being untrustworthy, nor did he cross-examine K about such an incident. Instead, he presented the defense theory described above—that, because of influence from another student, K made a false allegation against defendant.

After the verdict, but before sentencing, the defense learned that, in 2002, the sheriff's office had, in fact, investigated a claim by K that she had been sexually assaulted by another student. The Marion County District Attorney's office had reviewed the case and, not finding sufficient evidence to go forward, declined to prosecute the student. According to the information gathered by the sheriff's office, K and the alleged rapist, S, both attended a party in August

2002, during which K and he went to his car. K later stated that, while in the car, S raped her. S disputed that account, claiming that he and K attempted to have consensual intercourse, but that he stopped because she objected that it hurt her. In any event, after the encounter, K was bleeding severely.

When the trial court learned of the 2002 investigation, it reviewed the information from the hospital for that year; the original review, following defense counsel's instruction, had focused on *2003*. The 2002 hospital records revealed that, on the evening of the alleged sexual assault, K was taken to the emergency room, where she received multiple stitches to repair a vaginal tear. The contents of the medical records are not in the appellate record, but the evidence that is in the record indicates that several of the hospital employees were required under ORS 419B.005(3)(a) and ORS 419B.010 to report sexual abuse of minors, and none of them reported that K had been raped. Additionally, K told her mother that she had had sexual intercourse—not that she had been raped. Testimony by K's friends was mixed; some supported the rape theory and others suggested that she had engaged in consensual sex.

Based on the newly discovered information, defendant moved for a new trial. He contended that, because the evidence of the prior allegation was not disclosed to him, he had to change his trial strategy; with evidence to corroborate the statements of the students who believed that K was not a truthful person, he would have called them as witnesses and elicited testimony to that effect. Further, defendant argued that he would have cross-examined K about the prior allegation of sexual assault. Defendant also argued that, if he had had the information that had been gathered by the sheriff's office, he would have requested *in camera* inspection of the hospital records for 2002, the correct date, and would have obtained the medical records from K's emergency room visit the night of the party, and those records would have confirmed that K had made a false allegation.

Defendant reprises those arguments on appeal, contending that the prosecution's failure to disclose its investigation of K's 2002 allegation, along with the consequent failure to obtain the correct hospital records, impaired his ability

to impeach the state's most important witness, thereby depriving him of due process and entitling him to a new trial. The state responds that, under the governing rules of evidence, defendant would not have been allowed to use the allegedly exculpatory evidence for either purpose, so failing to disclose it to him in a timely manner caused no prejudice.

■ We review the trial court's denial of defendant's motion for a new trial for abuse of discretion. *State v. Smith*, 310 Or 1, 24, 791 P2d 836 (1990). A trial court abuses its discretion when its decision is not within the range of legally permissible choices. *State v. Rogers*, 330 Or 282, 312, 4 P3d 1261 (2000). It is not legally permissible for a trial court to deny a new trial for a *Brady* violation if there is a "reasonable probability" that the suppressed evidence would have resulted in a different outcome, *United States v. Bagley*, 473 US 667, 682, 105 S Ct 3375, 87 L Ed 2d 481 (1985), or, put another way, if the government's suppression "undermines confidence in the outcome of the trial." *Id.* at 678. Thus, our standard of review respecting defendant's first assignment of error is this: We require a new trial if we conclude that there is a reasonable probability that defendant would not have been convicted if he had had access to the prosecution's information regarding the 2002 allegation and the 2002 hospital report that the information would have enabled him to obtain.

The legal standards underlying our inquiry are well-settled, and many of the facts are undisputed. In *Brady*, 373 US at 87, the Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." In a later case, the Court explained that "[t]here are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 US 263, 281-82, 119 S Ct 1936, 144 L Ed 2d 286 (1999). Here, the parties agree that the state failed to turn over evidence in its possession that defendant

had requested and that the evidence was favorable to defendant. The issue is whether defendant was prejudiced by its suppression.

As the state correctly notes, suppressed evidence that would not have been admissible at trial is, in most instances and for that reason, immaterial—its existence could not have had any effect on the outcome. Therefore, the prosecution's failure to produce such evidence is, again in most instances, harmless, and the court's subsequent denial of a motion for a new trial based on an alleged *Brady* violation regarding such evidence is not error. *See Wood v. Bartholomew*, 516 US 1, 8, 116 S Ct 7, 133 L Ed 2d 1 (1995) (suppression of polygraph results impeaching state's witness does not violate *Brady* rule where polygraph evidence was inadmissible). According to the state, evidence that K might have lodged a false allegation of sexual abuse in 2002 was inadmissible under OEC 608(2), which provides:

> "Specific instances of the conduct of a witness, for the purpose of attacking or supporting the credibility of the witness * * * may not be proved by extrinsic evidence. Further, such specific instances of conduct may not, even if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness."

Thus, the state argues, because all of the suppressed evidence was inadmissible, it could not have altered the outcome in defendant's favor, and the trial court therefore did not err in denying defendant's motion for a new trial.

Defendant advances two arguments against the state's reasoning. First, he maintains that, under *State v. LeClair*, 83 Or App 121, 730 P2d 609 (1986), *rev den*, 303 Or 74 (1987), OEC 608(2) cannot constitutionally be applied where, as here, the witness has accused the defendant of a sexual crime and the prior conduct is a false allegation of sexual abuse.[3] Thus, he contends, the evidence would have been

---

[3] Defendant's argument relies on the Due Process Clause of the Fourteenth Amendment to the United States Constitution as applied in *Brady*, 373 US at 87. Under *Brady*, no due process violation occurs if the evidence withheld by the prosecution would have been inadmissible. *Wood*, 516 US at 8. Whether evidence is admissible is, in the first instance, a matter of state law. Thus, in this case, whether the state committed a *Brady* violation under the federal constitution depends on the interpretation of the state constitution in *LeClair*.

admissible, it would have impeached the state's principal witness, and therefore the court erred in denying the motion for a new trial. Second, he maintains that, if he had timely learned of K's earlier allegation, that would have provided corroboration of statements by other witnesses who asserted that K had a reputation for dishonesty, and, bolstered by that information, he would have called them to testify to that effect—even though, as defendant recognizes, they could not have testified as to any particular instance of dishonesty, including the allegedly false 2002 allegation. *See* OEC 608(1)(a) (permitting attack on credibility of witness by referring to character for untruthfulness). We are not persuaded by either of defendant's arguments.

We begin with defendant's argument that, under *LeClair*, the court was required to permit him to cross-examine K about her prior allegation. In *LeClair*, we held that,

"regardless of the prohibitions of OEC 608, the Confrontation Clause of Article I, section 11, requires that the court permit a defendant to cross-examine the complaining witness in front of the jury concerning other accusations she has made if 1) she has recanted them; 2) the defendant demonstrates to the court that those accusations were false; or 3) there is some evidence that the victim has made prior accusations that were false, unless the probative value of the evidence which the defendant seeks to elicit on the cross-examination (including the probability that false accusations were in fact made) is substantially outweighed by the risk of prejudice, confusion, embarrassment or delay."

83 Or App at 130. Defendant argues that this case falls within the second *LeClair* category because the evidence demonstrates that the prior allegation was false. To "demonstrate" that falsity, the evidence must manifest it "clearly, certainly, or unmistakably." *State v. Arellano*, 149 Or App 86, 91, 941 P2d 1089 (1997), *rev dismissed*, 327 Or 555 (1998) (quoting *Webster's Third New Int'l Dictionary* 600

(unabridged ed 1993)). The trial court concluded that the evidence here did not meet that burden:

> "I don't find that the allegation that [S] raped [the victim] is demonstrably false. There is, at best, some evidence in either direction, which might explain why the state decided they couldn't prove it beyond a reasonable doubt. But there's certainly some evidence that is supportive of that allegation, and it's just not, in my view, demonstrably false."

We review the trial court's conclusion under the second *LeClair* category for any evidence. *Arellano*, 149 Or App at 90. Here, there is support for the court's characterization of the evidence regarding the veracity of the 2002 allegation. Although some of the students at the party reported that K had suggested that she might want to have sexual intercourse with S, K told another friend that she was not going to do anything with S that evening. After her encounter with S, K was bleeding so severely that she had to be taken to the hospital, where she received stitches and a blood transfusion. Although K did not report that she had been raped that evening, she was "pretty out of it" at the time, and, within a few days of the incident, she told one of her friends that the intercourse had not been consensual.

Defendant also argues that, even if facts here do not put the case in the second *LeClair* category, they qualify it for the third (that is, there is "some evidence" that K made a prior false allegation); he could therefore have cross-examined her about that incident because "the probative value of the evidence which the defendant seeks to elicit on the cross-examination (including the probability that false accusations were in fact made)" is not "substantially outweighed by the risk of prejudice, confusion, embarrassment or delay." *LeClair*, 83 Or App at 130. The trial court erred, he asserts, when, after engaging in the balancing process, it concluded that the probative value *was* substantially outweighed by the various specified risks.

We review the court's conclusion under the third *LeClair* category for abuse of discretion. *Arellano*, 149 Or App at 90. Under that standard, the court reasoned:

"[O]n the one hand you have, at best, some evidence that maybe a false allegation was made in some context in which there's no evidence that [the victim] really gets any benefit from making this allegation. And on the other hand, you have a whole side trial into a separate incident where you're probably never going to have any conclusive evidence one way or another, and where you're going to significantly delay the proceedings and cause [the victim] to go through just a mortifying experience."

Although we might reach a different conclusion, we cannot say that the court abused its discretion. It noted that the allegation in this case, regarding an incident that occurred three years before the incident for which defendant was prosecuted and that involved a different abuser, was, for those reasons, less probative than a recent false allegation against the defendant himself would have been. Further, the danger of prejudice, confusion, embarrassment, and delay was significant; full exploration of the 2002 allegation would have necessitated a "trial-within-a-trial" involving events three years in the past and would have required K to undergo a "mortifying" experience. We therefore conclude that the trial court did not abuse its discretion when it ruled that, under OEC 608(2) as construed in *LeClair*, the defense would not have had a constitutional right to cross-examine K. Thus, defendant's argument that the *Brady* violation prevented him from cross-examining K fails; he could not have cross-examined her in any event.

Defendant's second argument in support of his contention that withholding evidence of a prior false allegation caused prejudice is based, as noted above, on the theory that, had defendant known about the allegation, he would have had more confidence in certain witnesses' potential testimony as to K's reputation for truthfulness, and would have adduced that testimony at trial instead of deciding not to do so. In making this argument, defendant acknowledges that he could not have examined those witnesses about the false

allegation itself; that line of questioning would have been inadmissible under OEC 608(2), and, because it did not involve cross-examination of an adverse witness, the *LeClair* exception would not apply.

In light of our standard of review—did the trial court abuse its discretion in rejecting defendant's argument that examining three character witnesses would, to a reasonable probability, have changed the outcome of the trial?—we conclude that the court did not err. Defendant's theory rests on at least two assertions: First, if he had known the facts about the allegation contained in the prosecution and hospital records, he would have made a tactical decision to put K's character for truthfulness in question; and second, the taint on her character for truthfulness that he could have created by virtue of the three witnesses' testimony would probably have been sufficient to change the outcome of the trial. We find that defendant's argument depends on highly speculative propositions, and, for that reason, we cannot conclude that the trial court abused its discretion in rejecting it.

In sum: The prosecution did not produce evidence that would have indicated that, in 2002, the state investigated a report by K that she had been raped. The evidence would have disclosed that the district attorney decided against prosecuting the alleged rapist. The withheld evidence also would have led to the discovery of hospital records disclosing that, the night of the alleged rape, K was treated at a local hospital for a vaginal tear, and that none of the medical personnel who were involved reported a rape, which they were required to do if they believed one had occurred. Nonetheless, we conclude that the evidence would not have been admissible for use in cross-examining K, nor in impeaching her credibility. At most, the defense could have used the evidence in calculating whether to adduce evidence from other witnesses as to K's general reputation for truthfulness. The trial court concluded that, used in that manner, the evidence did not create a reasonable probability that the result of the trial would have been different. That conclusion was not an

abuse of discretion. We therefore reject defendant's first and second assignments of error.[4]

Reversed and remanded.

---

[4] Our disposition of defendant's first three assignments of error obviates the need to address his assignment of error to the trial court's denial of his motion for a mistrial, based on the last sentences of the prosecutor's closing argument: "I'm asking you to vindicate [K]. I'm asking you to hold the defendant accountable. Thank you very much." We presume that, because the state has an interest in avoiding potentially reversible error, the issue will not arise on remand.

## APPENDIX

## *JOHNS* CASES INVOLVING THE ADMISSIBILITY OF UNCHARGED, ALLEGEDLY SEXUAL ACTS

We have deemed the evidence admissible in the following cases:

*State v. Parker*, 119 Or App 105, 849 P2d 1157, *rev den*, 317 Or 584 (1993). The defendant was charged with two counts of sexual abuse involving three different victims. *Id.* at 107. All of the abuse took place when the girls, aged 9, 10, and 11, visited the defendant for picnics or gatherings at his farm. In the process of holding that the court did not err in denying the defendant's motion to sever, we observed that, "[i]f the charges involving the three victims were separately tried, the evidence of defendant's admission and his relationship and conduct with each child would be admissible in each of the separate trials, because the evidence would be probative of defendant's intent." *Id.* at 108-09.

*State v. Wert*, 144 Or App 581, 927 P2d 1103 (1996), *rev den*, 325 Or 369 (1997). The defendant was charged with sexual abuse based on an incident in which he rubbed the buttocks of his nine-year-old neighbor while she was visiting him in his garage. *Id.* at 583. We held that the trial court did not err in admitting evidence that, three days later, the defendant rubbed the leg of the victim's 12-year-old friend when she was visiting him and told her that he wished he were younger or she were older. That evidence, we held, was relevant to prove that the defendant acted with sexual intent:

> "The sexual-abuse charge required proof that defendant intended sexual arousal or gratification when he touched the victim, and the incident involving [her friend] also required intent of sexual gratification; both the victim and Ella were in the same class of victims, *i.e.*, neighbor children interested in defendant's airplane; the incidents of physical abuse were similar in where and how they occurred and in defendant's fondling the lower bodies of the girls."

*Id.* at 584-85.

*State v. Stafford*, 157 Or App 445, 972 P2d 47 (1998), *rev den*, 329 Or 358 (1999). The defendant, a tutor, was charged with sexual abuse after he put his hand on the bare upper thigh of an eight-year-old student three times within a few moments and also lifted her up by putting his hands under her arms and across her chest. *Id.* at 447. We affirmed the trial court's ruling that allowed the state to adduce evidence that, approximately 20 years before the charged conduct, the defendant had acted similarly. Without extended discussion, we simply noted that, like the victim in the charged incident, the earlier "victims were young girls in a student-teacher relationship with defendant and that the characteristics of defendant's actions at that time were similar to his conduct in this case." *Id.* at 459.

*State v. Cockrell*, 174 Or App 442, 26 P3d 169, *rev den*, 332 Or 656 (2001). The defendant was charged with two counts of sexual abuse. The first was based on an incident in which he lifted his 11-year-old niece in the air while "roughhous[ing]" with her in front of a television and, while doing so, rubbed her crotch area for several seconds. The second incident, involving the same victim, occurred while she was playing the piano, and he touched her upper thigh for approximately five minutes. *Id.* at 444. The state introduced evidence of three earlier sex offense convictions. One involved the 12-year-old daughter of a woman the defendant was dating. He entered her bedroom "while she was sleeping, put his hand under her shirt, touched her breasts, moved his hand down inside her shorts, and penetrated her vagina with his fingers." *Id.* at 446. He also "engaged in the same sort of touching while he and [the victim] sat on a couch watching television." *Id.* In yet another incident, the defendant abused another victim when he interrupted her sleep by touching her breasts under her shirt and bra. *Id.* We held that the earlier incidents were admissible to rebut the defendant's argument that the charged conduct occurred with no sexual intent. We explained:

"Each touching occurred while the victims were involved in nonsexual activities. The surrounding physical circumstances of the incidents are also similar. There were no alcohol, drugs, violence, coercion or the use of weapons involved in any of the incidents. The types of touching

involved are similar—in each case, defendant used his hand to touch the sexual or intimate parts of the victims. Finally, there is the similarity in each of defendant's responses after being confronted about his conduct."

*Id.* at 449.

We have deemed evidence inadmissible in the following cases:

*State v. Rinkin*, 141 Or App 355, 917 P2d 1035 (1996). The defendant was charged with attempted sodomy after having approached the complainant, "A," at a bus stop.

> "Each of defendant's conversations with 'A' occurred in public, in the presence of other people. During those contacts, defendant talked to 'A' about 'skipping' school and 'doing things that his parents would not let him do.' On one occasion, when defendant learned that 'A' was interested in karate, he offered 'A' free lessons in his apartment, telling 'A' that he was welcome to come any time, so long as he came alone. On another occasion, defendant asked 'A' whether he had ever seen a *Playboy* magazine. When 'A' replied, 'No,' defendant offered him a *Playboy* if he would come to defendant's apartment."

*Id.* at 357. The evidence of prior uncharged conduct that the state argued was sufficiently similar was a series of letters that the defendant wrote to another boy, confessing a sexual encounter that was initiated after the defendant promised to show that boy a *Playboy* magazine. We held that the acts were not sufficiently similar. *Id.* at 369-70.

*State v. Sheets,* 160 Or App 326, 981 P2d 815 (1999), *rev den*, 332 Or 632 (2001). The defendant was charged with rape, sodomy, and sexual abuse of a five-year-old child for having "tried to put his crotch into [the victim's] crotch while bouncing her on his stomach" on a bed. *Id.* at 329. We held that earlier uncharged misconduct—an attempt to have intercourse with an 11-year-old for whom he was babysitting—was not sufficiently similar to be relevant to show the defendant's charged act was done with sexual intent. *Id.* at 331.

*State v. Dibala,* 161 Or App 99, 984 P2d 302 (1999), *rev den*, 332 Or 632 (2001). The defendant was charged with

sexual abuse based on an incident in which, while driving two 12-year-old boys in his truck, he "allowed them to take turns sitting on his lap to steer the truck. * * * The boys alleged that [the] defendant had an erection and moved his pelvis up and down so that it would rub against their buttocks." *Id.* at 101. To prove that he acted knowingly, the state sought to introduce evidence that the defendant had, on an earlier occasion, "admitted to police that he had fondled the clothed genitals of two boys, ages eight and seven, while he was babysitting them." *Id.* We held that

> "the physical elements of the two incidents are not so similar as to outweigh their differences. In the 1986 incident, defendant did not place the children on his lap nor did he rub an erection against them. The 1986 incidents took place in bedrooms; the current incident, in a truck. In the 1986 incident, defendant touched the victims' clothed genitals with his hands; in 1996, he is alleged to have touched the boys' clothed buttocks with a clothed erection and his pelvis. There was no evidence whether or not the defendant had an erection during the 1986 incidents."

*Id.* at 106.

*State v. Irons*, 162 Or App 512, 987 P2d 547 (1999), *rev den*, 330 Or 120 (2000). The defendant was charged with various sex crimes based on his having rubbed lotion on the crotch of a six-year-old girl for whom he was babysitting and with whom he was taking a bath. He denied a sexual intent. *Id.* at 515. To challenge that denial, the state sought to introduce evidence that the defendant had had a 14-year sexual relationship, including intercourse, with his stepdaughter, beginning when she was 14. *Id.* at 514. We held that the evidence was inadmissible under *Johns* to prove intent, because there was "no suggestion that [the] ongoing intra-familial relationship involved applying lotion, bathing together, or any of the other physical elements underlying the present charges." *Id.* at 522-23.

*State v. Leach*, 169 Or App 530, 9 P3d 755 (2000), *rev den*, 332 Or 632 (2001). The defendant was charged with sexual abuse of his stepdaughter on various occasions beginning when she was nine years old and ending when she was 14. The state sought to elicit evidence that defendant had asked

the complainant and a friend, when they were about 10 years old, whether they had any body hair; that, around the same time, he asked the girls whether they had any pubic hair; and that, when the girls replied that they did, the defendant "asked [the friend] if he 'could see hers' and pulled on the elastic waistband on the front of her panties." *Id.* at 532. We held that the uncharged misconduct was not sufficiently similar to the charged crimes to be admissible under *Johns*:

> "Here, at the least, evidence of defendant's prior statements to [the complainant] did not meet *Johns's* fourth (similarity of type of act) and fifth (similarity of physical elements) requirements. Asking a 10-year-old girl questions about her sexual development in the presence of her mother or friends is not the same or similar type of act as the intimate physical contact, constituting sexual abuse in the first degree, that is charged here. Moreover, although defendant allegedly commented on [the complainant's] sexual development while engaging in the charged crimes, the differences in 'physical elements' are manifest: The prior incidents involved comments and questions to [her], without any physical touching, in the presence of others."

*Id.* at 535.

*State v. Bunting*, 189 Or App 337, 76 P3d 137 (2003). The defendant was accused of providing the complainant with alcohol while watching television with her and then touching her breast through her clothing. To prove that the act was sexual in nature, the state sought to admit evidence of the defendant's conviction for having made alcohol available to a 14-year-old girl, taking her into a bedroom, and having intercourse with her. *Id.* at 343. We held that the earlier act was not sufficiently similar to admit under *Johns:* "[A]lthough defendant provided alcohol to each of the victims, other circumstances of the two incidents were not similar, including the relationship between defendant and the victim and, particularly, the type of touching involved." *Id.*

**ORTEGA, J.,** concurring.

I agree with the majority that two of defendant's comments to L—"I like the way you smell this time of month" and "I like the way your hips move when you do that"—were

too dissimilar to the charged incident to be admissible as evidence of defendant's intent when he engaged in the charged act. No counterpart to those overtly inappropriate comments about a student's body was present in the charged incident. Accordingly, those comments were not admissible. Because the error in admitting those comments was prejudicial, I agree that we must reverse and remand.

I disagree, however, with the majority's analysis of the evidence concerning defendant's touching L, H, and M and defendant's statements that directly related to those incidents. I would hold that that evidence was admissible because a jury could infer from that pattern of similar conduct that defendant engaged in the conduct at issue with the intent to gratify his sexual desires.

The evidence here was offered to show that defendant's intent in touching the victim was not innocuous, as he asserted. As the Supreme Court has observed, "[i]ntent or state of mind is often the most difficult element of a crime to prove because many crimes are unwitnessed and even if a witness is present, the witness can only surmise the actor's state of mind." *State v. Johns*, 301 Or 535, 551, 725 P2d 312 (1986). The difficulty of proving intent is especially great in a case such as this, where the conduct may have been innocuous or may have been carefully and deliberately calibrated to satisfy defendant's sexual desires while allowing him to avoid complaints and repercussions.

The evidence at issue was part of a pattern of conduct in which defendant touched female students in a way that pushed the boundaries of acceptable physical contact between a teacher and a student and that made the students uncomfortable. Evidence of a pattern of conduct tends to suggest the intent underlying the conduct. That inference does not arise from an assessment of the defendant's character. Rather, the relevance of the earlier conduct arises from the doctrine of chances—that is, the improbability that events will be repeated without the involvement of some intentional act. *Johns*, 301 Or at 552-55; *see also State v. Carreiro*, 185 Or App 19, 23-24, 57 P3d 910 (2002) (discussing case law concerning the doctrine of chances); *State v. Johnstone*, 172 Or App 559, 567, 19 P3d 966 (2001) (quoting part of *Johns's*

description of the doctrine of chances and noting that "[t]hus, under *Johns*, evidence of other bad acts can be used under some circumstances to demonstrate that a defendant acted with the requisite intent on one occasion because he had done so on other occasions"); *State v. Wieland*, 131 Or App 582, 587, 887 P2d 368 (1994) ("We read *Johns* as accepting [the doctrine of chances] theory of relevance for the purpose of proving that a defendant's charged conduct was not accidental, *i.e.* that the defendant acted with the requisite intent.").

The doctrine of chances involves an inductive reasoning process based on probability; each time that a possibly accidental event is repeated, it becomes more likely that the defendant acted with intent. *Johns*, 301 Or at 552-55. Accordingly, the more often the defendant engages in certain behavior, the less likely it is " 'that the defendant acted with an innocent state of mind. * * * In isolation, it might be plausible that the defendant acted accidentally or innocently; a single act could easily be explained on that basis. However, in the context of other misdeeds, the defendant's act takes on an entirely different light.' " *Id.* at 552-53 (quoting Edward Imwinkelried, *Uncharged Misconduct Evidence* 8, § 5:05 (1984)); *see also State v. Allen*, 301 Or 569, 577, 725 P2d 331 (1986) (deciding, in a companion case to *Johns*, that evidence of an earlier arson to which the defendant had confessed was admissible in a trial for a subsequent arson to negate evidence that the fire was an accident).

The *Johns* court emphasized the particularized nature of the inquiry regarding admissibility:

"These decisions must be made case-by-case * * *. The more prior similar acts, the stronger the probative value; the fewer, the less the probative value. The same is true of the similarity of the prior acts and of the time element. The prior acts need not be identical. The greater the degree of similarity of the prior acts, the greater the relevancy; the less similarity, the less probative value. As to the time element, the closer in time of the prior act to the act charged, the greater the probative value; the more remote, the less probative value. No categorical rule controls inclusion or exclusion."

301 Or at 555.

Following its discussion of the doctrine of chances and the fact-specific nature of the inquiry, the *Johns* court stated:

"To sum up, in evaluating prior crime evidence on the issue of intent or absence of mistake, the trial judge should make these determinations:

"(1) Does the present charged act require proof of intent?

"(2) Did the prior act require intent?

"(3) Was the victim in the prior act the same victim or in the same class as the victim in the present case?

"(4) Was the type of prior act the same or similar to the acts involved in the charged crime?

"(5) Were the physical elements of the prior act and the present act similar?

"(6) If these criteria are met, is the probative value of the prior act evidence substantially outweighed by the danger of unfair prejudice, confusion of issues or misleading the jury, undue delay or presentation of cumulative evidence?"

*Id.* at 555-56. In comparing the physical elements of the prior acts and the charged act, both the similarities and the dissimilarities must be fully considered. *State v. Pratt*, 309 Or 205, 214, 785 P2d 350 (1990) (determining that the dissimilarities between an earlier abduction and rape and the charged acts of rape and murder outweighed the similarities). The significance of the similarities must be decided on a case-by-case basis. "Some similarities are so common as to be trivial (for example, the offender spoke English during both crimes) while others may be so unusual as to be significant even standing alone (for example, the offender spoke a foreign language when he intended to rape, but spoke English otherwise)." *Id.* The significance of the similarities generally arises out of their combination. *Id.*

With those principles in mind, I would conclude that the evidence concerning defendant's hugging and singing to L, rubbing H's shoulders and talking with her about that

incident, and touching M's lower back are admissible. The evidence satisfies the five pertinent factors in the *Johns* test.[1]

First, there is no dispute that the charged act required intent. Second, the prior acts of touching and related comments were intentional, not accidental.[2] The trial court, in determining whether the evidence was admissible, could—and apparently did—find that the prior acts were carried out with a sexual intent. That finding is consistent with the Supreme Court's description of the doctrine of chances, that is, that a repeated act is likely to be an intentional act. Having made that finding, the trial court could properly admit the evidence, and the jury could consider the evidence in deciding whether the charged act was intentional.

Third, the victim in this case, one of defendant's female students, was in the same "class" (meaning category or type) as the girls whom defendant touched in the prior acts, who also were students in defendant's classes or on a school team coached by defendant.

Fourth, the types of acts are similar. The physical contacts (hugging L, rubbing H's shoulders, and touching M's lower back) are similar to the charged act in which defendant touched the victim's breasts. Each incident involved a touching, with defendant's hand or arm, of a student in a way that could be viewed as innocuous but that pushed the boundaries of appropriate touching. During or as a direct consequence of

---

[1] The sixth *Johns* factor is not pertinent here, because of OEC 404(4), which provides:

"In criminal actions, evidence of other crimes, wrongs or acts by the defendant is admissible if relevant except as otherwise provided by:

"(a) ORS 40.180, 40.185, 40.190, 40.195, 40.200, 40.205, 40.210 and, to the extent required by the United States Constitution or the Oregon Constitution, ORS 40.160;

"(b) The rules of evidence relating to privilege and hearsay;

"(c) The Oregon Constitution; and

"(d) The United States Constitution."

[2] In *Johns*, the court was addressing the admissibility of "prior crime evidence"—that is, the prior act at issue there was an incident that resulted in the defendant's conviction of "common assault." 301 Or at 555, 541. The *Johns* court thus was not required to consider the second element in a situation in which the prior acts may not have required *criminal* intent. Here, defendant apparently was never charged with any crime arising from the earlier acts, and we are not called on to decide that the earlier acts were criminal.

most of those acts of touching, defendant made comments to the students that made light of the incidents. As he hugged L, he sang a song to her. After he rubbed H's shoulders and she complained to a counselor, defendant asked her if she was uncomfortable, stated that he had been trying to cheer her up, and suggested that she "fix" any rumors about him. When he touched the victim, he jokingly said to her, "You better never miss my class again." In each case, the nature of the comments and the connection to the touching are similar.

Fifth, the physical elements of the prior acts of touching and the present act were similar. Each act occurred at school, during school hours or scheduled school activities. Each involved defendant's use of his hand or arm to touch a clothed female student on the upper portion of her body.

The evidence thus satisfies the *Johns* test. Returning to the big picture, then, the key question is this: Does the evidence that defendant touched L, H, and M make it more likely that, when he touched the victim, he did so with sexual intent? Without reference to defendant's character, the jury could find from the evidence that defendant engaged in a pattern of touching female students in a way that made the students uncomfortable and that defendant, by calibrating the offensiveness of the touching and making minimizing comments, insulated himself from complaints about his conduct. From that, a jury could infer that defendant's motivation for continuing to engage in such behavior, despite the discomfort that it caused the students, was to gratify his sexual desires. In other words, the repetition of the touching increases the possibility that it was intentional conduct rather than innocuous conduct that was misunderstood.

Of course, a reasonable jury might decline to draw the suggested inference, deciding instead that defendant had no sexual intent in any of the incidents. The fact that the evidence might be interpreted more than one way, however, generally does not preclude its admissibility. *See State v. Hampton*, 317 Or 251, 255, 855 P2d 621 (1993) ("The possibility that an inconsistent or contradictory inference may reasonably be drawn from the offered item of evidence does not destroy that item's relevancy so long as the inference desired by the proponent is also a reasonable one."); *see also*

*Johns*, 301 Or at 559 (concluding that, "although reasonable minds could differ on the admissibility of the evidence concerning the [prior] incident, we cannot say as a matter of law that the evidence was not probative on the issue of intent"). I would allow the state to offer the evidence of defendant's prior conduct to allow the jury to decide whether to draw an inference about defendant's intent in the charged incident.